# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELENA SHKLYAR, | ) | |
| | ) | |
| Plaintiff, | ) | 2:18-cv-1588 |
| | ) | |
| v. | ) | |
| | ) | Judge Marilyn J. Horan |
| CITY OF PITTSBURGH, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On November 26, 2018, Plaintiff Elena Shklyar filed suit against Defendant, City of Pittsburgh, alleging violations of Title VII of the Civil Rights Act; the Americans with Disabilities Act (ADA); the Pennsylvania Human Relations Act (PHRA); and 42 U.S.C. § 1983. (ECF No. 1). The City filed a Motion to Dismiss for Failure to State a Claim, (ECF No. 9), after which Ms. Shklyar amended her Complaint, (ECF No. 12). In response to Ms. Shklyar's Amended Complaint, the City filed a partial Motion to Dismiss, arguing that the Court should dismiss Counts II, III, and V in their entirety, as well as the retaliation claims under Count IV. (ECF No. 16). Both parties have briefed the issues raised as to the aforementioned Counts, (ECF Nos. 17, 20, 21, 22), and oral argument was held before this Court on September 12, 2019. The Motion is now ripe for decision.

For the following reasons, the partial Motion to Dismiss will be granted.

## I. Background

According to the Amended Complaint, Ms. Shklyar was born in the Soviet Union, where she received "the equivalent of a Bachelor's/Master's hybrid degree in accounting and finance"

1

and "minored in business information systems" with a focus on computers. (ECF No. 12, at ¶¶ 19, 21). Ms. Shklyar arrived in the United States in 1989 and obtained U.S. citizenship in 1995. *Id.* at ¶¶ 20, 24. Ms. Shklyar speaks English as her second language. *Id.* at ¶ 23. While living in the United States, she completed courses to supplement her computer skills. *Id.* at ¶ 22. The City of Pittsburgh hired Ms. Shklyar in November 1998 and offered her full-time employment in July 2000, where her official title within the Department of Innovation and Performance became Client Application Developer. *Id.* at ¶¶ 26, 28, 30.

On September 21, 2017, the City informed Ms. Shklyar that on December 31, 2017, her position as Client Action Developer would be "eliminated due to lack of work." *Id.* at ¶ 39. Lee Haller, Director of the Department of Innovation and Performance, indicated that it was his decision to terminate her because he "need[ed] to have the best staff in place to meet all the responsibilities on [their] plate." *Id.* at ¶¶ 90, 91. Ms. Shklyar alleges that six other employees' positions in other departments were eliminated as part of the City's fall 2017 reduction. *Id.* at ¶ 139. However, of over sixty-five positions in her department, Ms. Shklyar contends hers was the only position eliminated, and that her department hired at least twenty-three new employees after informing her that her position would be eliminated due to lack of work. *Id.* at ¶¶ 83, 85.

Around the time that Ms. Shklyar was informed that her position would be eliminated, Ms. Shklyar's supervisor, Heidi Norman, expressed a preference for a male employee because "at least [she] can understand him." *Id.* at ¶¶ 41, 81, 82. Based on this statement, in December 2017,[1] Ms. Shklyar spoke with the mayor's then-chief of staff, Kevin Acklin, about her fears of

---

[1] In the Amended Complaint, Ms. Shklyar alleges she spoke with Kevin Acklin in December 2018. (ECF No. 12, at ¶ 43). The City premised its initial argument in support of the partial Motion to Dismiss on the December 2018 date, arguing that this date provides evidence against a causal nexus between Ms. Shklyar's protected conduct and the alleged adverse employment action in her retaliation claims. (ECF No. 17, at 10). However, in her brief and at oral argument,

2

being targeted because of her national origin. *Id.* at ¶¶ 42, 43. Mr. Acklin informed Ms. Shklyar that she had no reason to worry. *Id.* at ¶¶ 43, 44. However, councilwoman Darlene Harris expressed concern to the City Council that terminating Ms. Shklyar, a Jewish Refugee, might expose the City to liability. *Id.* at ¶ 44. Ms. Shklyar also contends that she was not the only employee to allege discrimination against the City and that she was targeted for termination due to her supervisor's discriminatory animus. *Id.* at ¶ 142.

Ms. Shklyar was terminated from the Department of Innovation and Performance on December 31, 2017, in accordance with the notice she received three months prior in September 2017. *Id.* at ¶ 39. After meeting with the City to find alternate employment, Ms. Shklyar secured a new position with the Department of Public Works beginning on January 2, 2018. *Id.* at ¶¶ 46, 47, 51. Ms. Shklyar contends she was assured the new position would be in an office; however, the position required performing inventory in a warehouse. *Id.* at ¶¶ 49, 51. Unfortunately, Ms. Shklyar had an allergic reaction to the "extraordinary amount of dust" in the warehouse. *Id.* at ¶ 53. Her doctor prescribed steroids and informed her that she could not continue to work in that environment. *Id.* at ¶ 54.

Between January 2, 2018 and February 1, 2018, Ms. Shklyar applied for another position as a Business Analyst with the City. *Id.* at ¶¶ 51, 56, 60. Ms. Shklyar obtained additional training for this position at the City's request, and she was notified that she was qualified for the position. *Id.* at ¶¶ 57, 73. However, she was never interviewed for the Business Analyst position. *Id.* at ¶ 58. Around the same time, the City stated that it could not accommodate Ms. Shklyar's physician's request to move her from the warehouse because the essential duties of her

---

Ms. Shklyar explained that this was a typo and that the conversation took place in December 2017. (ECF No. 21, at ¶ 8). At oral argument, the City contended that even if the proper date is December 2017, the claim still fails.

position required her to be in the warehouse. *Id.* at ¶¶ 60, 73. Ms. Shklyar was terminated from the Department of Public Works on February 1, 2018. *Id.* at ¶ 60.

Based on the foregoing, Ms. Shklyar filed a complaint with the Equal Employment Opportunity Commission, and upon receiving a right-to-sue letter, filed the present suit. *Id.* at ¶ 13. In her Amended Complaint, Ms. Shklyar brings five Counts. In Count I, Ms. Shklyar alleges a national origin discrimination claim under Title VII. *Id.* at ¶¶ 78–101. Next, in Count II, she brings a disability discrimination claim under the Americans with Disabilities Act (ADA). *Id.* at ¶¶ 102–13. In Count III, Ms. Shklyar alleges retaliation claims under both Title VII and the ADA. *Id.* at ¶¶ 114–25. Further, in Count IV, Ms. Shklyar brings national origin discrimination, disability discrimination, and retaliation claims under the Pennsylvania Human Relations Act (PHRA). *Id.* at ¶¶ 126–32. Finally, in Count V, Ms. Shklyar alleges a violation of the Fourteenth Amendment's Equal Protection Clause, pursuant to 42. U.S.C. § 1983. *Id.* at ¶¶ 133–47. The City's partial Motion to Dismiss challenges the sufficiency of Counts II, III, and V, as well as the retaliation claims under Count IV. (ECF No. 16).

## II. Standard of Review

In accordance with Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A pleading may be dismissed for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To survive such a motion to dismiss, the short and plain statement of the claim must contain sufficient factual allegations "to raise a right of relief above the speculative level." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, to state a claim, the complaint must contain enough factual matter, taken as true, to show that the claim is plausible. *Id.* at 556. Stated differently, a claim is facially plausible when the pleading contains

4

sufficient facts to draw a reasonable inference that the defendant is liable for the conduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard. *Id.*

The reviewing court must undertake a three-step analysis to determine if a complaint will survive a motion to dismiss. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the court must identify the elements necessary to state the claim. *Id.* Second, it must ignore pure legal conclusions, and it need not accept "unsupported conclusions and unwarranted inferences." *Id.*; *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013). Finally, with the well-pleaded facts remaining, it must "determine whether they plausibly give rise to an entitlement to relief." *Connelly*, 809 F.3d at 787 (citing *Iqbal*, 556 U.S. at 676). The plausibility of the well-pleaded facts is judged using the court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. Discussion

The City seeks dismissal of Counts II, III, and V, as well as part of Count IV. While the City views each of the incidents alleged in the Amended Complaint in an isolated manner, Ms. Shklyar argues that the incidents should be viewed holistically, as interrelated events. Accordingly, the Court will analyze the claims in what the Court understands to be the chronological order of events, beginning with the Title VII retaliation claim, then proceeding on to the ADA discrimination and ADA retaliation claims. Finally, the Court will address the § 1983 and PHRA claims.

A. Title VII retaliation claim

The City does not challenge the sufficiency of Ms. Shklyar's Title VII claim in Count I, but moves to dismiss Ms. Shklyar's Title VII retaliation claim, found in Count III of the Amended Complaint. Title VII states that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against an employee who has opposed an employer's discriminatory conduct or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to an employer's discriminatory conduct. 42 U.S.C. § 2000e-3(a). To establish a prima facie case for Title VII retaliation, a plaintiff must show that (1) she engaged in conduct protected by Title VII; (2) her employer took adverse action against her; and (3) a causal link existed between her protected conduct and the employer's adverse action. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016); *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

The City does not dispute that Ms. Shklyar's complaint to then-chief of staff Kevin Acklin constitutes protected conduct under Title VII. Rather, the City moves to dismiss this claim on the basis that Ms. Shklyar failed to show she engaged in protected conduct before the alleged adverse employment action, that is, her termination in December 2017, occurred. (ECF No. 17, at 9). To the contrary, Ms. Shklyar alleges that the City retaliated against her through several adverse employment actions: the December 2017 termination, her placement in a warehouse position, and the February 2018 termination. (ECF No. 12, at ¶¶ 115, 116, 118). This dispute between the parties raises three issues: first, whether there is a causal connection between the protected conduct— Ms. Shklyar's complaint to Mr. Acklin—and her December

2017 termination from her original position; second, whether the City's hiring of Ms. Shklyar for the warehouse position is an adverse employment action, and if so, whether there is a causal connection between her hire and her complaint to Mr. Acklin; and third, whether there is a causal connection between Ms. Shklyar's complaint to Mr. Acklin and her February 2018 termination from the warehouse position.

*i. Causal nexus between complaint to Mr. Acklin and December 2017 termination*

First, Ms. Shklyar must prove that a causal link connects her complaint to Mr. Acklin to her termination from the Department of Innovation and Performance in December 2017. To show the existence of a causal link, a plaintiff must plead facts showing: "(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Whether temporality alone is sufficient to establish a causal nexus is largely fact-based. *Id.* at 279. Indeed, the Third Circuit has held that even a gap of two days can be unpersuasive if not paired with additional facts. *Id.* at 280.

Ms. Shklyar was informed on September 21, 2017, that her position would be terminated on December 31, 2017. (ECF No. 12, at ¶ 39). In December 2017, she lodged an informal verbal complaint with Kevin Acklin about her fears of being discriminated against due to her national origin. *Id.* at ¶ 43. On December 31, 2017, Ms. Shklyar was terminated in accordance with the September 2017 notice. *Id.* at ¶ 39. Ms. Shklyar's termination could not have been caused by her complaint to Mr. Acklin because the termination decision, and Ms. Shklyar's notification thereof, occurred three months before she complained to Mr. Acklin. Thus, there is

no causal nexus between Ms. Shklyar's protected conduct, that is, her complaint to Mr. Acklin, and her December 2017 termination.

> *ii. Whether hiring Ms. Shklyar for a warehouse position was an adverse employment action, and if so, whether a causal nexus to her complaint existed*

Next, Ms. Shklyar must show that the City's offer, and her acceptance, of employment in a warehouse position constituted an adverse employment action, and if so, whether there was a causal connection between her hire and her complaint to Mr. Acklin. As defined by the language of Title VII, an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Komis v. Sec'y of the United States, Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (internal quotations omitted). Stated differently, an adverse employment action occurs when a reasonable person could find that their employment was "substantially worsened." *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 577 (M.D. Pa. 2004). Thus, minor actions, such as lateral transfers and changes of title, are generally insufficient to constitute an adverse employment action. *Langley v. Merck & Co., Inc.*, 186 Fed. App'x. 258, 260 (3d Cir. 2006). Additionally, reassignment positions must be "inferior to, rather than merely different from," the prior position in order to constitute an adverse employment action. *Id.* at 261.

Here, Ms. Shklyar alleges that after she told Mr. Acklin that she believed her position was eliminated because of her national origin, the City retaliated against her by placing her in an inferior warehouse position. (ECF No. 12, at ¶¶ 42, 43, 115, 116, 118). However, unless Ms. Shklyar is able to plead facts showing that the City had an obligation to provide her with other employment to replace her eliminated position within the Department of Innovation and Performance, Ms. Shklyar's hire for the warehouse position in the Department of Public Works

8

was not a reassignment. Ms. Shklyar's hire did not "substantially worsen" her employment situation, which was otherwise unemployment after December 31, 2017. Stated differently, rather than becoming unemployed, Ms. Shklyar was offered, and she accepted, a new position in a new department. As such, Ms. Shklyar has failed to plead an adverse employment action as to her position in the warehouse. Accordingly, the Court does not need to analyze causation related to this act.

*iii. Causal nexus between complaint to Mr. Acklin and February 2018 termination*

Finally, Ms. Shklyar must prove that a causal link connects her protected conduct—her complaint to Mr. Acklin in December 2017—to her termination from the Department of Public Works in February 2018. As previously explained, to show the existence of a causal link, a plaintiff must plead facts showing: "(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *DeFlaminis*, 480 at 267 (3d Cir. 2007). Again, whether temporality alone is sufficient to establish a causal nexus is largely fact-based. *Id.* at 279.

In December 2017, Ms. Shklyar lodged an informal verbal complaint with Kevin Acklin about her fears of being discriminated against due to her national origin. *Id.* at ¶ 43. Ms. Shklyar began working for the Department of Public Works on January 2, 2018. *Id.* at ¶¶ 50, 51. Subsequently, Ms. Shklyar was terminated from the Department of Public Works on February 1, 2018. *Id.* at ¶ 60. More than a month separates her complaint and her subsequent termination in February. Additionally, Ms. Shklyar does not plead facts that connect her complaint to Mr. Acklin about national origin discrimination to her February 2018 termination from the Department of Public Works, other than her conclusory allegation that such a connection exists.

9

Since she has not pleaded facts supporting a causal nexus, the Court cannot draw a reasonable inference that her February 2018 termination was retaliation for complaining to Mr. Acklin.

In sum, even though Ms. Shklyar pleads facts regarding two adverse employment actions (the December 2017 termination and the February 2018 termination), she does not plead facts to show a causal nexus between each of those adverse employment actions and her complaint to Mr. Acklin. Therefore, Ms. Shklyar's Title VII retaliation claim in Count III must be dismissed.

B. ADA claim

The City also moves to dismiss Count II of the Amended Complaint, in which Ms. Shklyar brings a claim of disability discrimination under the ADA. (ECF No. 12, at ¶ 103). Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 41 U.S.C. § 12112(a). To prove disability discrimination under the ADA, the plaintiff must establish that "s/he (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Burskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002).

As regards the first element, the ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of [the] individual." 42 U.S.C. § 12102(1)(A). The ADA specifies that major life activities include, among other things, "standing, lifting, bending, speaking, breathing, learning." 42 U.S.C. § 12102(2)(A). A major life activity is "substantially limited" under the statute when the individual is unable to perform the major life activity as compared to most people in the general population. *Rocco v. Gordon*

*Food Service*, 988 F. Supp. 2d 422, 425 (W.D. Pa. 2014). Importantly, however, a temporary impairment or a non-chronic illness is not a disability under the ADA. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002). For example, in *Rinehimer*, a foreman at an elevator manufacturing company worked in facilities containing paint fumes and sawdust, causing him to contract pneumonia. *Id.* at 378–79. The Third Circuit concluded that the pneumonia caused by dust and fumes in the warehouse was merely a temporary impairment of breathing ability and did not constitute a disability under the ADA. *Id.* The court also noted that, in contrast to the plaintiff's pneumonia, the plaintiff's sensitivity to dust and fumes was not temporary. *Id.* at 381. Nonetheless, the court found that the plaintiff's dust sensitivity did not substantially limit a major life activity, and thus did not meet the definition of "disability" within the meaning of the ADA. *Id.*

Ms. Shklyar alleges that the dusty warehouse where she worked in the Department of Public Works impaired her breathing, and that said impairment constitutes a disability under the ADA. (ECF No. 12, at ¶ 103). Ms. Shklyar further claims that the City violated the ADA by refusing to accommodate her by moving her out of the warehouse, even though she was qualified for another position. *Id.* at ¶ 108. The City seeks dismissal of this claim on the basis that Ms. Shklyar's allergy does not constitute a valid disability under the ADA. (ECF No. 17, at 11).

Similar to the plaintiff in *Rinehimer*, Ms. Shklyar alleges she suffered an allergic reaction to the dust from the warehouse that impaired her breathing. (ECF No. 12, at ¶ 53). Her doctor prescribed steroids and advised that she could not continue to work in the warehouse after her allergic reaction to the dust. *Id.* at ¶¶ 53, 54. However, an allergic reaction like Ms. Shklyar's is not indicative of a permanent condition, but rather a temporary one. Moreover, Ms. Shklyar does not plead facts to show how her breathing was "substantially limited," not just temporarily

impaired. Ms. Shklyar thus does not plead facts to establish that she has a disability within the meaning of the ADA, and the ADA claim in Count II must be dismissed.

C. ADA retaliation claim

Next, the City moves to dismiss the remainder of Count III of the Amended Complaint, in which Ms. Shklyar brings a claim of retaliation under the ADA. The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The elements to prove an ADA retaliation claim are the same as for Title VII: (1) the plaintiff engaged in protected conduct; (2) the plaintiff suffered an adverse employment action by the defendant; and (3) there is a causal relationship between them. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004). Importantly, even where a plaintiff has not pleaded sufficient facts to constitute a disability under the ADA, "the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997). Thus, "[a]n individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA." *Id.*

*i. Protected conduct*

First, Ms. Shklyar must prove she engaged in protected conduct under the ADA. Relevant here, requesting an accommodation qualifies as protected conduct if the plaintiff has a

reasonable, good faith belief that the requested accommodation is necessary and appropriate. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003).

Ms. Shklyar alleges she engaged in protected conduct by requesting a reasonable accommodation to be moved from the warehouse position due to her allergies. (ECF No. 12, at ¶¶ 53, 55). There is nothing in the record to suggest anything other than a good faith belief on behalf of Ms. Shklyar that her requested accommodation was reasonable, and the City does not argue to the contrary. Ms. Shklyar sought a medical opinion to diagnose her allergies, and she alleges that her allergies from the warehouse dust were "severe." *Id.* at ¶¶ 53, 54. The Court thus may draw a reasonable inference that Ms. Shklyar's request for accommodation was reasonable and made in good faith. Therefore, Ms. Shklyar engaged in protected conduct by requesting such an accommodation.

*ii. Adverse employment action*

Second, Ms. Shklyar must prove the City took an adverse employment action against her. As discussed above in the Title VII context, an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment," *Komis*, 918 F.3d at 292 (internal quotations omitted), and includes acts related to the "hiring, advancement, or discharge of employees," 42 U.S.C. § 12112(a). Additionally, a refusal to reasonably accommodate an employee can constitute an adverse employment action. *Brunson v. Peake*, 2011 U.S. Dist. LEXIS 94880, at *34 n.8 (E.D. Pa. Aug. 24, 2011). However, because an employer is only obligated to reasonably accommodate an employee where that employee has a disability within the meaning of the ADA, 42 U.S.C. § 12112, a refusal to accommodate an employee who does not have a disability cannot be an adverse employment action.

Ms. Shklyar contends that the City retaliated against her when it refused to accommodate her request to be moved from the warehouse. (ECF No. 12, at ¶ 118). Under these facts, however, the City was not obligated to reasonably accommodate Ms. Shklyar because she did not have a disability within the ADA. Thus, the City did not take an adverse employment action against her by failing to accommodate her.

Ms. Shklyar also contends that the City retaliated against her by "refus[ing] to place her in an available position for which she was eligible and qualified," and by not giving her "so much as an interview" for a Business Analyst position *Id.* at ¶¶ 56, 60, 118. Ms. Shklyar alleges that she obtained additional training for this position at the City's request, and she was notified that she was qualified for the position. *Id.* at ¶¶ 57, 73. As noted above, refusing to hire and failing to promote are adverse employment actions. Thus, Ms. Shklyar pleads facts regarding adverse employment actions to the extent that she alleges that the City refused to consider her in the hiring process for the Business Analyst position.

In addition, Ms. Shklyar also alleges that she was terminated from the Public Works warehouse position in February 2018.[2] Because termination is an adverse employment action, Ms. Shklyar has sufficiently pleaded this termination as an adverse employment action.

*iii. Causation*

Finally, Ms. Shklyar must prove there is a causal link between her protected conduct, that is, her request for accommodation, and the City's refusal to consider her in the hiring process for the Business Analyst position. And, she must also prove a causal link between her claim of retaliation and her February 2018 termination. As previously stated, to show the existence of a

---

[2] It is unclear in Count III whether Ms. Shklyar considers this termination to be related to her ADA retaliation claim, but in the interest of being thorough, the Court will consider it here.

14

causal link, a plaintiff must plead facts showing "an unusually suggestive temporal proximity" or "a pattern of antagonism coupled with timing to establish a causal link." *DeFlaminis*, 480 F.3d at 267.

At some point after January 2, 2018, when Ms. Shklyar began working in the warehouse, and before her February 2018 termination, she requested accommodation from the City. (ECF No. 12, at ¶ 51, 55, 60). Also, during this time, Ms. Shklyar alleges she attempted to obtain the Business Analyst position. *Id.* at ¶ 56. Even though her request for accommodation and her application for the Business Analyst position occurred in close temporal proximity, the timing is not necessarily suggestive, much less "unusually suggestive." Ms. Shklyar was suffering from allergies at the warehouse position, so she took action—she sought an accommodation in her then-current position and she sought a different position altogether. That Ms. Shklyar's request for accommodation and her application for the Business Analyst position (and thus the City's hiring process in relation to Ms. Shklyar) are in close temporal proximity is related more to Ms. Shklyar's attempts to change her situation, than it is suggestive of discrimination on the part of the City. More than just temporal proximity is therefore needed to show that the City's refusal to hire Ms. Shklyar occurred because she requested an accommodation. Ms. Shklyar does allege that the City did not interview her even after notifying her that she was qualified for the Business Analyst position and requesting that she obtain training for the position, but such does not provide an causal link between the decision not to interview or hire her and the request for accommodation. Accordingly, without more, Ms. Shklyar does not plead sufficient facts to link her request for accommodation to her not being considered for the new position.

As to her February 2018 termination, it appears from the facts pleaded that the City terminated Ms. Shklyar because, due to her allergies, she was not able to perform the essential

15

function of the Public Works warehouse position of spending time in the warehouse to conduct inventory and other tasks. Therefore, according to the facts pleaded, Ms. Shklyar was terminated for not being able to perform the job, not because she sought accommodation. Further, she does not plead any facts that might show how the City's reasoning was pretext.

In sum, because Ms. Shklyar does not plead facts showing a causal link between her request for accommodation and the City's failure to interview and hire her, or between her request for accommodation and her termination from the Public Works warehouse position, the ADA retaliation claim in Count III must be dismissed.

D. Section 1983 claim

Next, the City moves to dismiss Count V of the Amended Complaint in which Ms. Shklyar alleges that the City violated her rights under the Fourteenth Amendment's Equal Protection Clause. (ECF No. 12, at ¶¶ 134, 135, 136, 137, 146). The City makes several arguments, primarily that the § 1983 claim is impermissibly duplicative of the Title VII claim, and that Ms. Shklyar fails to plead facts showing a policy or custom as required by *Monell*.

*i. Whether § 1983 claim is impermissibly duplicative of Title VII claim*

First, the City claims that Ms. Shklyar's § 1983 claim is impermissibly duplicative of her Title VII claim. (ECF No. 22, at 5). Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage...subjects, or causes to be subjected, any citizen of the United States...the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. In a pertinent Third Circuit case, *Williams v. Pennsylvania Human Relations Commission*, the plaintiff contended that the Pennsylvania Human Relations Commission, as

well as her individual supervisors, violated her federal rights under Title VII and the ADA, and sought to vindicate those rights through § 1983. *Williams v. Pa. Human Rels. Comm'n*, 870 F.3d 294, 295 (3d Cir. 2017). The court explained that § 1983 does not confer any substantive rights, but rather allows a method for vindicating rights that are conferred by the federal Constitution or statutes. *Id.* at 297. However, when an independent method to vindicate the rights at issue already exists, such method trumps the method offered by § 1983. *Blessing v. Freestone*, 520 U.S. 329, 341 (1997). As such, "plaintiffs may not seek damages under § 1983 for stand-alone violations of either Title VII or the ADA" because independent enforcement methods for both statutes already exist. *Williams*, 870 F.3d at 297. When there are state or federal agencies authorized to grant relief for the discrimination at issue, employees must resort to those remedies rather than § 1983. *Id.* at 298. To allow a plaintiff to use § 1983 as the mechanism for redressing Title VII and ADA violations would be to "thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified." *Id.* at 299. Additionally, "permitting a plaintiff to sue under § 1983 based on violations of these same statutes would open *individuals* . . . to employment discrimination suits." *Id.*

Here, the City argues that Ms. Shklyar's § 1983 claim falls within the *Williams* holding, and is thus impermissibly duplicative, because Ms. Shklyar is seeking redress for national origin discrimination that is also covered under Title VII. (ECF No. 17, at 5). However, *Williams* applies only when a plaintiff is attempting to use § 1983 to vindicate statutory rights, not when a plaintiff seeks redress for constitutional violations such as those afforded by the Equal Protection Clause. Mrs. Shklyar explicitly alleges that the City's discriminatory conduct violated her constitutional rights under the Equal Protection Clause. (ECF No. 12, at ¶ 134). The City's

confusion perhaps comes about because, under the facts of this case, the rights at issue under Title VII and the Equal Protection Clause appear to overlap: under each, Ms. Shklyar alleges that she was discriminated against on the basis of her national origin.[3] Nonetheless, because Ms. Shklyar's § 1983 claim is expressly based upon the Equal Protection Clause, not Title VII, her § 1983 claim is not impermissibly duplicative of her Title VII claim.

*ii. Whether Ms. Shklyar fails to allege a policy or custom*

Second, the City contends that Ms. Shklyar further fails to allege a policy or custom that would implicate § 1983 liability. (ECF No. 22, at 6). An agency or municipality may not be sued pursuant to § 1983 unless the municipality's policy or custom caused the plaintiff's injury. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). A "'[p]olicy…[is] made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). A custom can be shown when "'a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Roman*, 914 F.3d at 798 (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A custom is comprised of the persistent practices of a municipality. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001). A mere recitation of prior complaints against a municipality is not enough to state a claim; the plaintiff must also show how "those prior incidents deserved discipline and how the misconduct in those

---

[3] The difference, however, is that under Title VII, a plaintiff alleges that her *employer* discriminated against her, whereas under the Equal Protection Clause, a plaintiff alleges that a *state actor* discriminated against her. The Court understands how, at first blush, a Title VII claim and an equal protection claim appear identical when an employer is a state actor.

cases is similar to that involved in the present action." *Mariani v. City of Pittsburgh*, 624 F. Supp. 506, 511 (W.D. Pa. 1986); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 973 n.7 (3d Cir. 1996).

Ms. Shklyar contends the City engaged in a discriminatory policy or custom in that six employees were terminated in addition to her, and that she is not the only individual to file a complaint alleging discrimination against the City. (ECF No. 12, at ¶¶ 139, 142). Without more, however, these facts fail to establish an official proclamation, policy, or edict issued by a decisionmaker with final authority to establish that policy. Moreover, these facts are not enough to show that this behavior is a well-settled and permanent custom of the City. The six terminations could have been for many reasons, and Ms. Shklyar does not plead facts that suggest they were part of an official policy of the City. Ms. Shklyar does not allege a persistent practice of national origin discrimination, as much as she pleads an isolated reduction in employees in the fall of 2017. (ECF No. 12, at ¶ 139). She does not plead when, or for what period, other employees filed complaints alleging discrimination. She does not plead the types of discrimination alleged by the other employees, or whether the alleged discrimination claims were similar to her national origin discrimination claim. Thus, she fails to allege a custom or policy in her § 1983 claim. Accordingly, Ms. Shklyar's claim under § 1983 in Count V must be dismissed.

E. PHRA retaliation claim

Finally, the City moves to dismiss the national origin and disability retaliation claims in Count IV of the Amended Complaint, wherein Ms. Shklyar contends the City's discriminatory conduct constitutes retaliation in violation of the PHRA. *Id.* at ¶ 129. The PHRA makes it unlawful for an "employer because of the race, color, religious creed, ancestry, age, sex, national

origin or non-job related handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor." 43 P.S. § 955. PHRA retaliation claims are analyzed in the same manner as Title VII and ADA retaliation claims. *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2012).

Ms. Shklyar failed to plead sufficient facts to establish claims for retaliation in violation of Title VII and the ADA. Applying those same analyses here, Ms. Shklyar's retaliation claims under the PHRA also fail. Accordingly, the PHRA retaliation claims in Count IV must be dismissed.

## IV. Conclusion

Based on the foregoing, the Defendant City of Pittsburgh's partial Motion to Dismiss is GRANTED. Ms. Shklyar is granted leave to amend the Amended Complaint in accordance with this Opinion no later than **December 9, 2019**.

IT IS SO ORDERED.

DATE November 18, 2019

Marilyn J. Horan
United States District Judge